**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

OLIVER SALMON,

                                  Plaintiff,

       vs.                                                          **1:10-CV-32**
                                                                      **(MAD/RFT)**

**T.L. HANSEN, individually and in his official**
**capacity as an Albany, New York Police Officer; J.**
**KITTLEMAN, individually and in his official**
**capacity as an Albany, New York Police Officer;**
**JOHN DOE 1, the name being fictitious but intended**
**to represent one or more Albany, New York Police**
**Officers, individually and in their official capacity as**
**Albany, New York Police Officers; JOHN DOE 2, the**
**name being fictitious but intended to represent one or**
**more Albany, New York Police Officers, individually**
**and in their official capacity as Albany, New York**
**Police Officers; CITY OF ALBANY POLICE**
**DEPARTMENT; and THE CITY OF ALBANY,**
**NEW YORK,**

                                  **Defendants.**

_____

APPEARANCES:                                    OF COUNSEL:

**OFFICE OF KEITH F. SCHOCKMEL**              **KEITH F. SCHOCKMEL, ESQ.**
4 Atrium Drive
Suite 290, Executive Woods
Albany, New York 12205
Attorneys for Plaintiff

**CITY OF ALBANY DEPARTMENT OF LAW**         **JOHN JOSEPH REILLY, ESQ.**
City Hall, 24 Eagle Street                     **ANDREW H. WOOD, ESQ.**
Albany, New York 12207                         **WILLIAM G. KELLY, ESQ.**
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On January 8, 2010, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights as a result of events that occurred on the morning of August 19, 2007. *See* Dkt. No. 1. The complaint contains six counts that allege federal and state-law causes of action for, among other things, false imprisonment, false arrest, illegal seizure, malicious prosecution, intentional infliction of emotional distress, and racial profiling. *See id.* at ¶¶ 65-83.

Currently before the Court are Defendants' motion for summary judgment and Plaintiff's cross motion for summary judgment as to liability.

**II. BACKGROUND**

On August 19, 2007, in the early morning, Plaintiff and two other men were driving on North Pearl Street, in Albany, New York. *See* Dkt. No. 19-2 at ¶ 7. A large crowd of people congregating in the street blocked the way, forcing the driver of the vehicle to attempt to go around. *See id.* at ¶ 8. Plaintiff claims that, as the driver attempted to go around the crowd, it appeared that someone in the crowd had hit the car, so the driver pulled over to investigate. *See id.* at ¶ 9. Thereafter, Plaintiff alleges that, as soon as he and the driver exited the car, they were attacked by the crowd. *See id.* at ¶ 10. Plaintiff claims that, once he was able to break free from his attackers, he first ran to Jillian's nightclub to seek help, but was refused. *See id.* at ¶ 16. Upon being refused, Plaintiff alleges that he found a taxicab and got inside. *See id.* at ¶ 17. The cab, however, refused to leave as the crowd surrounded the vehicle.

On August 19, 2007, Defendants Hansen and Kittleman were working the midnight shift. *See* Dkt. No. 18-17 at ¶¶ 2, 4.  At some point during the early morning hours of August 19, 2007, Defendants Hansen and Kittleman were dispatched to the area near Jillian's nightclub, which is located at 59 North Pearl Street, because of a report of a fight with multiple stab victims.  *See id.* at ¶¶ 6-7; Dkt. No. 19-2 at ¶ 18.  Upon Defendant Kittleman's arrival, he was directed by Sergeant James Gallagher to act as crowd control and to prevent further incidents of violence.  *See* Dkt. No. 18-17 at ¶ 8.  Upon arriving, "Defendant Hansen observed a 'chaotic' scene with at least 100 people in the vicinity, 'running and scattering all over the place.'"  *See* Dkt. No. 19-2 at ¶ 20 (citing Hansen deposition, pages 32, 47).  Upon Defendant Hansen's arrival, however, she stopped at the area of the intersection of Pine and Pearl Streets because she was flagged down by a taxicab driver.  *See id.* at ¶ 11; Dkt. No. 19-2 at ¶ 19.  Defendant Hansen asserts that the taxicab driver told her that Plaintiff had gotten into the back seat of his taxi and told him to "get out of here." *See* Dkt. No. 18-17 at ¶ 12.  Upon approaching the taxicab, several members of the crowd that surrounded the car yelled that Plaintiff, the occupant of the taxi, had stabbed somebody.  *See id.* at ¶ 16; Dkt. No. 19-2 at ¶ 28.  Several other people in the crowd, however, yelled that Plaintiff had not done anything wrong and that Defendants were taking into custody the wrong person.  *See* Dkt. No. 19-2 at ¶ 31

Plaintiff was then transported to the emergency room at Albany Medical Center for treatment of a stab wound that he sustained at some point prior to his arrest.  *See* Dkt. No. 19-5 at 3.  While at the emergency room, Defendant Hansen took Plaintiff's property and observed that he had three cell phones in his possession.  Plaintiff explained that he found a third phone on the ground when he retrieved his and the driver's phones, which had both been knocked from their hands during the crowd's attack.

At the same time that Plaintiff was being treated for his stab wound at Albany Medical Center, an individual named Robert Hanks was also there for treatment of a wound that he had suffered during the same incident on Pearl Street. *See* Dkt. No. 19-2 at ¶¶ 42, 51. Defendant Kittleman accompanied Mr. Hanks. *See id.* at ¶¶ 44,58. Mr. Hanks gave Defendant Kittleman a statement concerning the morning's events. *See id.* at ¶ 44. In this statement, Mr. Hanks informed Defendant Kittleman that his cell phone was missing and that he dropped the phone during that morning's incident. *See id.* at ¶¶ 57-58.

As a result of the incidents on the morning of August 19, 2007, Plaintiff was charged with Assault in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, and Criminal Possession of Stolen Property. *See* Dkt. No. 19-5 at 4. Plaintiff was denied bail and he spent three additional nights in jail. *See id.*

In support of the charges, Defendants obtained the supporting deposition of John Mantynen, an alleged eyewitness to the events of that morning and Mr. Hanks' friend. *See* Dkt. No. 18-15. In Mr. Mantynen's sworn statement, he stated that he and Mr. Hanks were outside watching as bouncers from a nightclub were trying to get a person who was involved in a fight to leave. *See id.* at 1. While this was occurring, everyone observing the events "kind of ended up in the middle of the street and then a car drove by and [Mr. Mantynen] heard a thump and saw that the side mirror clipped somebody and the mirror then fell off." *See id.* At this point, someone in the crowd yelled at the car, which stopped as the crowd moved towards it. *See id.*

Mr. Mantynen then described the driver of the vehicle and a passenger, who was later identified as Plaintiff. *See id.* (noting that the "passenger was wearing a light brown jump suit and had his hair in a ponytail and had a baseball hat on"). Mr. Mantynen stated that, after the men in the car exited their vehicle, fighting resumed and Mr. Hanks was next to the driver and the driver

was getting "pushed around." *See id.*  At this point, Mr. Mantynen claims that he "saw the passenger who was wearing the light brown jump suit go up and cut [Mr. Hanks] on the forehead." *See id.*  Mr. Mantynen admits, however, that he "didn't see a knife or anything sharp in the guy's hand but I saw the minute he struck [Mr. Hanks] on the forehead and slashed him blood started coming from [Mr. Hanks'] forehead." *See id.*  After trying to get the bouncers at Jillian's nightclub to restrain Plaintiff and following the attacker while he fled the scene, Mr. Mantynen went back to the nightclub he was at to get Mr. Hanks and others they were with. *See id.* at 1-2. Mr. Mantynen claims that, after returning, he noticed that "[t]hey had the guy who slashed [Mr. Hanks] in cuffs in front of Jillians." *See id.*  He then approached the police and "told him [that he] was positive that the guy they had in handcuffs was the guy who" cut his friend. *See id.* at 2. Despite the fact that Plaintiff was no longer wearing his hat, he was still wearing the light brown jumpsuit and ponytail, and Mr. Mantynen stated that he "was positive that the guy they had in handcuffs was the guy who" cut his friend. *See id.*  At some point after this event, Detective Kevin Quinlivan told Mr. Mantynen that Plaintiff was the person in custody. *See id.*

In a decision and order dated September 16, 2008, Albany City Court Judge Rachel L. Kretser dismissed the Criminal Possession of a Weapon in the Fourth Degree charge filed against Plaintiff because the information was insufficient on its face. *See* Dkt. No. 19-10 at 1-2.  The court noted that the supporting deposition stated that Mr. Mantynen "didn't see a knife or anything sharp in the [Plaintiff's] hand." *See id.* at 2.  As such, the court found that the "non-hearsay allegations fail to establish, if true, every element of the offense charged." *See id.* (citation omitted).  Thereafter, the court refused to dismiss the Criminal Possession of Stolen Property in the Fifth Degree charge because of Defendant Kittleman's sworn statement. *See id.* at 3.

At a hearing on May 8, 2009, the remaining charges against Plaintiff were dismissed "in the interest of justice[.]"  *See* Dkt. No. 19-11 at 3.

## III. DISCUSSION

**A.    Standard of review**

### *1. Summary judgment standard*

A court may grant a motion for summary judgment only if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quoting *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d at 58) (other citation omitted).  Furthermore, in assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).

Federal Rule of Civil Procedure 56 provides that, if a non-moving party fails to oppose a summary judgment motion, then "summary judgment, *if appropriate,* shall be entered against the adverse party." Fed. R. Civ. P. 56(e)(2) (emphasis added).  The Second Circuit has made clear, however, that where the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial[,]" *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.

6

2001), and that he is entitled to judgment as a matter of law, *see Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).

Moreover, in determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  Rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Relief under 42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**B.     False arrest**

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).  Under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

Defendants do not contest the first three elements.  Accordingly, the only question is whether Plaintiff's arrest was "privileged" or "justified."  "'Justification may be established by showing that the arrest was based on probable cause.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted).  Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation omitted). "The existence of probable cause must be determined on the basis of the totality of the circumstances, . . . and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (internal citation and quotation omitted).  "An officer retains probable cause to arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330 (S.D.N.Y. 2005) (quotation and other citations omitted).

8

Defendants assert that Defendant Hansen had probable cause to arrest Plaintiff for committing the crimes of assault and criminal possession of a weapon.  *See* Dkt. No. 18 at 4. Further, Defendants contend that Defendant Kittleman had probable cause to arrest Plaintiff for criminal possession of stolen property.  *See id.* at 5-6.  Plaintiff argues that Defendants did not have probable cause to arrest him because, among other things, the alleged probable cause resulted from hearsay statements that failed to satisfy both parts of the *Aguilar-Spinelli* test.  *See* Dkt. No. 19-5 at 7-8.

The Court agrees with Defendants.  Considering the totality of the circumstances, Defendants had probable cause to arrest Plaintiff for the assault charge based on the allegations proffered by the witnesses when Defendants arrived at the scene.[1]  As the Second Circuit has held,

---

[1] Plaintiff also argues that his arrest was not based upon probable cause because Defendants failed to satisfy the *Aguilar-Spinelli* test.  Plaintiff's reliance on *Aguilar-Spinelli* is misplaced.

The *Aguilar-Spinelli* test derives from two Supreme Court cases: *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969).  Together, the two cases require a court, when evaluating whether probable cause exists for a warrant based on hearsay information, to determine whether the warrant application includes (1) information supporting a conclusion that the informant was reliable and credible, and (2) the basis for the informant's knowledge.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court abandoned this dual-pronged inquiry in favor of a "totality of the circumstances" test, but New York courts still adhere to the *Aguilar-Spinelli* test in interpreting its state constitution.  *See, e.g., People v. Griminger*, 71 N.Y.2d 635 (1988).

In *Panetta v. Crowley*, 460 F.3d 388 (2d Cir. 2006), the Second Circuit set forth the probable cause standard under the United States Constitution.  Specifically, the Court held that

> information gleaned from informants can be sufficient to justify the existence of probable cause.  "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," *Martinez*, 202 F.3d at 634 (citation omitted), unless the circumstances raise doubt as to the person's veracity, *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1995).  The

(continued...)

"'a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest.'" *Rutligliano v. City of New York*, 326 Fed. Appx. 5, 8 (2d Cir. 2009) (quoting *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006)) (other citation omitted).

For example, although not charged with this crime, in New York, a person is guilty of assault in the third degree when:

> 1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or
>
> 2. He recklessly causes physical injury to another person; or
>
> 3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument.

---

[1](...continued)
> reliability or veracity of the informant and the basis for the informant's knowledge are two important factors. *Caldarola*, 298 F.3d at 162. "[A] tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is especially significant in establishing probable cause. *Florida v. J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). Moreover, information provided by "an identified bystander with no apparent motive to falsify" has "a peculiar likelihood of accuracy," *Caldarola*, 298 F.3d at 163 (citation omitted), and we have endorsed the proposition that "an identified citizen informant is presumed to be reliable." *Id.* at 165.

*Panetta*, 460 F.3d at 395.

In the present matter, Mr. Mantynen was a bystander, with no apparent motive to falsify; and, therefore, his statement had "'a peculiar likelihood of accuracy.'" *Id.* (quotation omitted). Further, his statement was corroborated by other witnesses, who similarly had no apparent motive to lie. Accordingly, the Court finds that these statements from eyewitnesses provided probable cause to arrest under the now-controlling standard and that Plaintiff's reliance on *Aguilar-Spinelli* is misplaced. Moreover, even if *Aguilar-Spinelli* was still controlling, Defendants had sufficient evidence to satisfy this test.

N.Y. Penal Law § 120.00.  Considering the totality of the circumstances, Defendants had probable cause to arrest Plaintiff for Assault in the Third Degree.  The fact that he was later charged with a more serious offense, for which probable cause might not have been present, does not change this result for purposes of a false arrest claim.  *See Davis*, 373 F. Supp. 2d at 332-33.[2]

Based on the foregoing, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's false arrest claim.[3]

**C.    Malicious prosecution**

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person – *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty."  *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).  To assert a Fourth Amendment claim for malicious prosecution under section 1983, a plaintiff must show a deprivation of her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions."  *See id.*

The elements of malicious prosecution under section 1983 are virtually identical to the elements of the same claim under New York law.  *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted).  To state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing

---

[2] As discussed in more detail below, and contrary to Plaintiff's arguments, the Court also finds that Defendants had probable cause to arrest Plaintiff for all three crimes with which he was eventually charged.

[3] As discussed below, the Court finds that, in the alternative, Defendants are entitled to qualified immunity on Plaintiff's false arrest claim.

the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted).  To sustain a malicious prosecution claim pursuant to section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutligliano*, 326 Fed. Appx. at 8-9 (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).  "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . *an* offense[,]' a prosecution requires probable cause 'to charge [the suspect] with *each* of the crimes.'" *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)) (emphasis added).  As such, when considering Plaintiff's malicious prosecution claim, the Court must individually consider each count with which Plaintiff was charged as a result of the August 19, 2007 incident.  *See id.*

Defendants do not contest that they initiated or continued a criminal proceeding against Plaintiff, or that the proceedings terminated in Plaintiff's favor.  Further, it is clear that Plaintiff's three-day imprisonment was sufficient to satisfy post-arraignment liberty restraint necessary to implicate his Fourth Amendment rights.  Accordingly, the Court must only determine if questions of fact exist as to whether Defendants had probable cause for commencing the proceeding and whether actual malice was a motivation for Defendants' actions.  *See Jocks*, 316 F.3d at 136 (quotation omitted).

### 1. Probable cause

#### a. Assault in the Second Degree

Plaintiff contends that Defendants Hansen and Kittleman lacked a legal foundation for any of the crimes with which he was charged. *See* Dkt. No. 19-5 at 10.  Regarding the assault in the second degree charge, Plaintiff claims that, at the time he was charged, it was clear that Mr. Hanks did not suffer from a "serious physical injury" or from a "physical injury by means of a deadly weapon or dangerous instrument." *See id.* at 12-13.

In relevant part, a person is guilty of assault in the second degree when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument[.]"  N.Y. Penal Law § 120.05(2). "Physical injury" is defined as an "impairment of physical condition or substantial pain."  N.Y. Penal Law § 10.00(9).

In *Gillis v. Edwards*, 445 F. Supp. 2d 221 (N.D.N.Y. 2006), the evidence established that the victim suffered a laceration to his left elbow and that this injury was treated by medical personnel at a local hospital. *See id.* at 238.  The court found that there was sufficient evidence to support the second degree assault conviction, including the physical  injury requirement. *See id.*; *see also People v. Fallen*, 194 A.D.2d 928, 928 (3d Dep't 1993) (finding that a three-centimeter laceration of the victim's left palm, which bled profusely and which required stitches and resulted in a scar, "was sufficient evidence from which the jury could infer substantial pain absent any testimony from the victim concerning the degree of pain she actually felt").

Also unavailing is Plaintiff's contention that Defendants' lacked probable cause to charge him with this offense because no weapon was ever recovered.  In *People v. Vincent*, 231 A.D.2d 444 (1st Dep't 1996), the court held that it was unnecessary for the police to recover the weapon in

order to prove the defendant's guilt beyond a reasonable doubt because the medical evidence established that the victim "suffered a smooth cut," which belied the defendant's claim that the victim's injuries were not caused by a dangerous weapon.  *See id.* at 445; *see also People v. Brown*, 52 A.D.3d 1237, 1238 (4th Dep't 2008) (holding that "[t]he nature of the victim's wounds supports the inference that defendant used a sharp, dangerous instrument to inflict the victim's injuries and that the victim could not have sustained those wounds in the manner suggested by defendant at trial").

In the present matter, Mr. Mantynen's statement described the attack, and then described the appearance of the suspect, including the fact that he was a black male, who got out of a car with a friend, and was wearing a "brown jump suit and had his hair in a ponytail and had a baseball hat on."  *See* Affirmation of Andrew H. Wood dated June 13, 2011 ("Wood Aff.") at Exhibit "N."  After returning to the club they were at and then returning to the scene, Mr. Mantynen stated that "the guy that slashed Bobby" was sitting in front of the club, in handcuffs and that he informed the officers of this and the fact that, although Plaintiff was no longer wearing the baseball cap, he was certain that Plaintiff was the person who stabbed his friend.  *See id.*

Moreover, the record also makes clear that Mr. Hanks was treated for a 4.5 inch laceration to his forehead.  *See* Dkt. No. 19-7 at 43.  This injury, which is consistent with an injury inflicted by a deadly weapon, was sufficient to establish probable cause that a deadly or dangerous instrument was used and that Mr. Hanks was in substantial pain.  *See id.*; *see also* Dkt. No. 19-2 at ¶ 41.  Finally, Mr. Mantynen stated that he lost track of Plaintiff once he fled the scene. Defendants could reasonably believe that, in this time before Plaintiff was apprehended, he discarded any weapon or dangerous instrument in his possession.

This uncontroverted evidence was clearly sufficient to establish probable cause to have charged Plaintiff with assault in the second degree.  As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's malicious prosecution causes of action relating to the assault in the second degree charge.

### b. Criminal Possession of a Weapon in the Fourth Degree

Plaintiff claims that, "[p]erhaps the most patently groundless charge filed against [him] was Criminal Possession of a Weapon in the Fourth Degree."  *See* Dkt. No. 19-5 at 14.  Plaintiff asserts that Mr. Mantynen's affidavit was insufficient to provide probable cause for this charge. *See id.* at 14-15.

In New York, a person is guilty of criminal possession of a weapon in the fourth degree when "[h]e possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]"  N.Y. Penal Law § 265.01(2).  "[A] knife 'may be considered a "dangerous knife" within the meaning of Penal Law §§ 265.01(2) when the circumstances of its possession, including the behavior of its possessor, demonstrate that the possessor himself considered it a weapon, even if the knife might not otherwise be defined as a "dangerous knife" by reason of its inherent characteristics.'"  *People v. Jackson*, 38 A.D.3d 1052, 1054 (3d Dep't 2007) (quotation and other citation omitted).

Contrary to Plaintiff's position, Defendants had probable cause for bringing this charge against him.  Although Plaintiff correctly notes that no weapon was ever recovered or produced, Mr. Mantynen's statement provides that he saw the passenger who was wearing the light brown jump suit "go up and cut Bob on the forehead."  *See* Wood Aff. at Exhibit "N."  Mr. Mantynen

went on to state that he "didn't see a knife or anything sharp in the guy's hand but [he] saw the minute he struck Bob on the forehead blood started coming from [his] forehead.  Then the crowd got the driver on the ground and everyone was yelling to 'get the knife out of his hand'."  *See id.*  Further, Mr. Mantynen claimed that Plaintiff then ran from the scene and was apprehended by the police after a short period of time.  *See id.*  Further, it is uncontested that, although several witnesses informed Defendants that Plaintiff was innocent, others in the crowd informed them that the person in the back seat of the taxi, *i.e.* Plaintiff, had just stabbed somebody.  *See* Woods Aff. at Exhibit "D."

In *People v. Oglesby*, 15 A.D.3d 419 (2d Dep't 2005), the victim sustained a thirteen-centimeter laceration on his face as a result of a punch inflicted by the defendant.  *See Oglesby*, 15 A.D.3d at 419.  The victim stated that he observed "a chain with a medallion hanging from the defendant's wrist as the defendant threw the punch."  *Id.*  The Second Department held that this evidence, in addition to the fact that the nature of the wound was consistent with a wound caused by dangerous instrument, was sufficient to support the conviction for criminal possession of a weapon in the fourth degree and assault in the second degree.  *See id.* at 419-420 (citations omitted); *see also People v. Greene*, 72 A.D.3d 1279, 1279-80 (3d Dep't 2010) (upholding convictions for assault in the second degree and criminal possession of a weapon in the third degree where the defendant used a "barbecue fork" against the victim).

The fact that the weapon was never recovered or seen by Defendants does not mean that probable cause to bring this charge was lacking.  In fact, New York courts have upheld convictions for criminal possession of a weapon in the fourth degree when the evidence supporting the charge was simply testimony of the victim or a witness describing the alleged weapon.  *See People v. Limpert*, 186 A.D.2d 1005, 1005 (4th Dep't 1992) (citation omitted); *see*

*also People v. Melendez*, 130 A.D.2d 771, 772 (2d Dep't 1987); *People v. Fabre*, 17 Misc.3d 1122(A), 2007 WL 3194524, *2 (Sup. Ct. N.Y. Co., July 26, 2007) (holding that "[t]he mere fact that the defendant might not have possessed the gun when he was arrested is not a defense to a charge that he possessed it four days earlier with intent to use it unlawfully against another person"); *People v. Davis*, 47 A.D.3d 506, 507 (1st Dep't 2008) (holding that the defendant was not entitled to an affirmative defense to robbery that the object displayed may not have been a "loaded weapon capable of producing death or other serious injury" simply because the police did not recover a weapon.); *People v. Smith*, 220 A.D.2d 547, 547 (2d Dep't 1995) (same); *Matter of Clem F.*, 198 A.D.2d 223, 224 (2d Dep't 1993) (holding that, "despite the fact that the BB gun was never recovered or placed into evidence at the hearing, the evidence was legally sufficient to establish that the appellant was guilty of unlawful possession of a weapon"); *People v. Hechavarria*, 158 A.D.2d 423, 424-25 (1st Dep't 1990) (holding that the evidence was sufficient to convict the defendant of weapon possession even though no weapon was recovered.); *People v. Purpera*, 81 A.D.2d 1007, 1007-08 (4th Dep't 1981) (holding that the evidence was sufficient to support the conviction for criminal possession of a weapon in the third degree where the gun was not recovered and witnesses "observed no part of the gun protruding from the car but only the flash of the gunshot from within").  Finally, it is uncontested that Mr. Hanks' injury was consistent with a wound inflicted with a dangerous instrument, which further supports the probable cause determination.  *See* Dkt. No. 19-2 at ¶ 41; Dkt. No. 19-7 at 43.

Based on the foregoing, the Court finds that, based upon the undisputed facts, Defendants had probable cause to charge Plaintiff with criminal possession of a weapon in the fourth degree; and, therefore, the Court grants Defendants' motion for summary judgment as to this claim.

### c. *Criminal Possession of Stolen Property in the Fifth Degree*

Plaintiff claims that, at the time of the incident, Mr. Hanks told Defendant Kittleman that he dropped his phone; however, Defendant Kittleman now asserts that Mr. Hanks told him that his phone was "missing."  *See* Dkt. No. 19-5 at 10-11.  Further, Plaintiff alleges that Mr. Hanks gave Defendant Kittleman "a written statement stating he dropped his phone, which [Defendant] Kittleman altered to read 'person or persons unknown did steal [his phone].'"  *See id.* at 11.  Plaintiff then claims that Defendant Kittleman "filed a sworn statement stating that 'of my own knowledge' the phone was reported stolen to the Albany Police Department.'"  *See id.*  Moreover, Plaintiff claims that Mr. Mantynen's supporting deposition, which was the only deposition submitted in support of the charges, confirms that Plaintiff simply "picked up the phone from the ground."  *See id.*

"A person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof."  N.Y. Penal Law § 165.40.

Contrary to Plaintiff's assertions, probable cause existed to charge him with this offense.  It is undisputed that, during the altercation, Mr. Hanks' phone ended up on the ground and that this occurred in Plaintiff's presence.  Further, it is uncontested that, immediately prior to fleeing the area, Plaintiff picked up Mr. Hanks' phone.  Defendants were entitled to reasonably infer that Plaintiff intended to dispose of the phone, knowing that it belonged to Mr. Hanks, so as to thereby impede in the recovery thereof.  The fact that Mr. Hanks may have dropped the phone during the altercation is immaterial.  Plaintiff's intent must be determined as of the moment of the taking of the phone, *see People v. Brooks*, 79 N.Y.2d 1043, 1045 (1992); *People v. Figueroa*, 219 A.D.2d

509 (1995); and it is for the trier of fact to determine whether an accused possessed the necessary mental culpability, not the charging officer, *see People v. Cabey*, 85 N.Y.2d 417, 421-22 (1995).

As such, given the totality of the circumstances and in light of the undisputed evidence, the Court finds that Defendants had probable cause for charging Plaintiff with criminal possession of a weapon in the fifth degree; and, therefore, grants Defendants' motion for summary judgment as to this claim.

### 2. Actual malice

Actual malice "'does not require a plaintiff to prove that the defendant was motivated by spite or hatred[,]'" but instead that he initiated the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *See Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977). Both federal and New York courts have held that, while

> "lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." . . . A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 156 A.D.2d 28, 34 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (holding that, "[i]n most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

19

Contrary to Plaintiff's assertions, nothing in the record supports the proposition that Defendants acted with malice in charging Plaintiff with the crimes set forth above.  In the complaint for criminal possession of stolen property in the fifth degree, Defendant Kittleman stated that "Officer Hansen was collecting property from [Plaintiff] at which time [Plaintiff] did have in his possession and under his control (1) Nextel Blackberry Model RAW20IN Cell Phone belonging to the victim, Robert Hanks, and reported stolen to the Albany Police Department."  *See* Wood Aff. at Exhibit "I."  Although Plaintiff argues that Defendant Kittleman "altered" Mr. Hanks' written statement to read "person or persons unknown did steal" his phone, Defendant Kittleman's deposition makes clear that Mr. Hanks approved the changes and signed the sworn statement after the changes had been made.  *See* Dkt. No. 19-14 at 45-48.  This act, which Mr. Hanks approved of, does not establish the requisite malice.  Similarly, as discussed above, the fact that Defendants failed to include in their report any possible exonerating evidence is insufficient to show malice.  Significantly, Defendants were directed to accompany Plaintiff and Mr. Hanks to the hospital, thereby making it impossible to conduct further investigation and interrogation of additional witnesses at the scene.  Finally, Mr. Mantynen's statement provided sufficient evidence to support the charges filed, even in the absence of any statements made by Defendants.  Significantly, this statement was taken by two officers not named as defendants in the present action.  Nothing in the record indicates that Mr. Mantynen's statement was false, or that Defendants had knowledge about any potential misrepresentation.

Based on the foregoing, the Court finds that, in light of the undisputed facts, Plaintiff failed to establish that Defendants had actual malice in initiating the criminal proceedings against him.  Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claims.

**D.      Qualified immunity**

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit").  "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider in either order.  *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted).  The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citations omitted).  The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "To determine whether a right is clearly established, we look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under

preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Schecter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)).  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Krause v. Bennett*, 887 F.2d 362 (2d Cir. 1989), the plaintiff alleged that the defendant, a New York state trooper, had violated his constitutional rights during the course of events leading up to and including the plaintiff's arrest on a charge of possession of stolen property.  *See Krause*, 887 F.2d at 364-65.  At trial, it was established that the defendant saw a stop sign hanging on the plaintiff's wall and came to investigate.  *See id.* at 365.  The defendant proceeded to question the plaintiff about the sign, and the plaintiff told the defendant that he had obtained it from a friend for whom he had done some plumbing work.  *See id.*  The plaintiff was not able to find his friends phone number right away, but provided it to the defendant the next day.  *See id.*  Nevertheless, the defendant never called the plaintiff's friend to attempt to verify his story and, instead, verified that the sign was owned by Saratoga County and that it had been missing since at least May 15, 1967.  *See id.* at 366.  The defendant then consulted with a assistant district attorney and applied for an arrest warrant on a charge of criminal possession of stolen property.  *See id.*  The information the defendant filed charged the plaintiff with criminal possession of stolen property in the third degree.  *See id.*

Reversing the district court's decision that the defendant was not entitled to qualified immunity, the Second Circuit first noted that "where a defendant has given a 'full explanation' of the story behind his or her possession of certain property, and there is no evidence to impugn that story, a conviction cannot be had for possession of stolen property, as the essential element of

knowledge has not been proved." *Id.* at 370 (quotation omitted).  The court went on to state that "the question presented to the district court was not whether [the plaintiff] could have been convicted of possession of stolen property, but whether probable cause existed for [the defendant] to believe that [the plaintiff] had committed that crime.  Even if [the plaintiff] had actually gone to trial and been acquitted, that result would have no bearing on the determination of whether probable cause existed to arrest him." *Id.* (citing *Warren v. Byrne*, 699 F.2d 95, 98 (2d Cir. 1983)).  The court noted that, at the time the defendant arrested the plaintiff, he knew that the plaintiff possessed the sign, that the sign had been stolen, that it had identifying markings on the back of it, and that the plaintiff said that he did not know that it was stolen.  *See id.*  The court held that this information was sufficient to support a finding of probable cause to arrest.  *See id.* The court noted that it is impossible for a police officer to ascertain, with any degree of reasonable certainty, that a suspect possessed a particular state of mind at the time the act was committed; and, therefore, the defendant "was entitled to rely on the implications of the information known to him in assessing whether [the plaintiff] possessed this knowledge." *Id.* at 371 (citation omitted). The Second Circuit noted that, "[i]t bears repeating that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful.  'It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation." *Id.* (quotation omitted).  Finally, the court held that "[i]t is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer." *Id.* at 372 (citation omitted).  As such, the Court held that the defendant was entitled to qualified immunity as a matter of law.

As in *Krause*, the Court finds that Defendants are, in the alternative, entitled to qualified immunity.  First, although Plaintiff repeatedly professed his innocense of the crimes alleged,

Defendants actions were objectively reasonable.  Given the circumstances they were facing, it was not unreasonable for Defendants to arrest Plaintiff.  Although some people in the crowd apparently yelled to the officers that they were arresting the wrong person, most of the available evidence indicated that Plaintiff was, in fact, guilty.  This evidence included the taxicab driver's statement, Mr. Mantynen's sworn statement, in which he positively identified Plaintiff as the person who attacked Mr. Hanks, and other statements provided by several unnamed witnesses.

Further, Defendants acted reasonable in charging Plaintiff with each of three crimes. Although no weapon was found, Mr. Hanks' wound was consistent with being inflicted by a dangerous instrument or weapon and Mr. Mantynen's statement provides that, although he did not see a weapon in Plaintiff's hand, as soon as Plaintiff "slashed [Mr. Hanks] blood started coming from [his] head."  *See* Wood Aff. at Exhibit "N."  Moreover, Mr. Mantynen stated that "the guy that cut [Mr. Hanks]" then fled the scene.  *See id.*  While away from the scene, Defendants could reasonably believe that Plaintiff was able to discard any weapon he may have had.  Finally, Defendants actions cannot be looked at in a vacuum, but must be considered in light of the situation that they faced.  Defendants went to Pearl Street in response to reports of a fight with multiple stab victims and were confronted with a "'chaotic'" scene with at least one-hundred people.  *See* Dkt. No. 19-2 at ¶ 20 (citing Hansen deposition, pages 32, 47).  Defendants were only briefly at the scene when they were directed to transport Mr. Hanks and Plaintiff to the hospital for treatment.  Defendants' actions were objectively reasonable when considering the information they gathered at the scene, from Plaintiff and Mr. Hanks, and that which was provided by their fellow officers.

Considering all of the information available to Defendants, and in light of the precarious situation in which Defendants found themselves, the Court finds that Defendants acted in an

objectively reasonable manner in both arresting Plaintiff and charging him with all three crimes. As such, the Court finds that, in the alternative, Defendants are entitled to qualified immunity; and, therefore, grants Defendants motion for summary judgment.

**E.     Equal protection**

In count VI of the complaint, Plaintiff appears to allege an equal protection cause of action in that he claims that Defendants' conduct "was instituted and continued against plaintiff because plaintiff is a Black male." *See* Dkt. No. 1 at ¶ 82.  In their memorandum of law in support of their motion for summary judgment, Defendants argue that this claim must fail because Plaintiff has failed to offer any proof that he was arrested solely because he is a black male. *See* Dkt. No. 18-16 at 8-9.  Plaintiff failed to respond to this portion of Defendants motion for summary judgment.

Since Plaintiff failed to respond to Defendants' arguments regarding his equal protection claim, the Court finds that Plaintiff has abandoned this claim. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (holding that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way" (citing *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases))); *Nat'l Commc'ns Ass'n, Inc. v. American Tel. & Tel. Co.*, No. 92 Civ. 1735, 1998 WL 118174, *28 (S.D.N.Y. Mar. 16, 1998) (holding that, where the plaintiff did not address claim in response to the defendant's summary judgment motion, the claim is deemed "abandoned" and the defendant granted summary judgment); *Anti–Monopoly, Inc., v. Hasbro, Inc.*, 958 F. Supp. 895, 907 & n.11 (S.D.N.Y. 1997) (holding that "the failure to provide argument on a point at issue constitutes abandonment of the

issue"); *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (same).

As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's equal protection claim.[4]


**F.      Remaining Defendants**

Plaintiff has also brought claims against the City of Albany Police Department, City of Albany, as well as "'John Doe1,'" and "'John Doe2,' the names being fictitious but intended to represent one or more Albany, New York Police Officers[.]"  Plaintiff, however, failed to allege any facts supporting his assertion that these unnamed police officers violated his constitutional rights.  Further, as discussed above, Plaintiff has not established that he was deprived of any constitutionally protected right; and, therefore, Plaintiff's claims against the municipal Defendants must be dismissed.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force

---

[4] Even if the Court were to address the merits of Plaintiff's equal protection claim, the Court would still find that Defendants' motion should be granted as to this claim.  Ordinarily, "[t]o state a claim for an equal protection violation, [the plaintiff] must allege that a government actor intentionally discriminated against [him] on the basis of race, national origin or gender." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).  The plaintiff must allege that he was "'selectively treated'" as "'compared with others similarly situated'" based on "'impermissible considerations'" such as race or with the "'intent to inhibit or punish the exercise of constitutional rights[.]'" *Giordano v. City of N.Y.*, 274 F.3d 740, 750-51 (2d Cir. 2001) (quotation omitted).

In this case, Plaintiff has not established differential treatment that resulted from intentional and unlawful discrimination.  The only allegation regarding impermissible discrimination alleges that "Defendants' extreme and outrageous conduct as set forth above was instituted and continued against plaintiff because plaintiff is a Black male." *See* Dkt. No. 1 at ¶ 82.  This unsupported allegation is clearly insufficient to create an issue of fact to defeat Defendants' motion for summary judgment.

is quite beside the point"); *see also Rutigliano*, 326 Fed. Appx. at 9 (affirming summary judgment dismissal of the plaintiff's *Monell* claim where the court dismissed all of the plaintiff's section 1983 claims); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a *Monell* claim); *Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001) (same).

Although "there are limited exceptions to this rule where the injuries complained of are not solely attributable to the actions of named individual defendants, or where a jury concludes that the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity, neither of these exceptions applies here." *Bonilla v. Jaronczyk*, 354 Fed. Appx. 579, 582 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also Rutigliano*, 326 Fed. Appx. at 9 (observing that a municipality may be found liable under section 1983 even in the absence of individual liability "only in very special circumstances" (citing *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (holding that the district court should have permitted the jury to decide whether the municipal defendants were liable irrespective of the liability of the individual defendants where there was evidence that a multi-member commission may have violated the plaintiff's First Amendment rights)).

Since the Court has found that none of the individual Defendants' violated any of Plaintiff's constitutional rights, and because his alleged injuries were solely attributable to the individual Defendants, the Court grants Defendants' motion for summary judgment as to the remaining individual and municipal Defendants.

**G.     State-law claims**

In his complaint, in addition to his federal causes of action, Plaintiff asserts several state-law causes of action.  District courts have supplemental jurisdiction over all state-law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.  *See* 28 U.S.C. § 1367(a). Application of supplemental jurisdiction is discretionary, however, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law."  *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted).

Since the Court has granted Defendants' motion for summary judgment as to all of Plaintiff's federal causes of action and taking into consideration the factors listed above, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law causes of action.


**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross motion for summary judgment is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

   **ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close

this case.

**IT IS SO ORDERED.**

Dated: November 30, 2011
       Albany, New York

Mae A. D'Agostino
U.S. District Judge